FRANK L. BOYD, Appellant, v. BOONE NATIONAL BANK et al., Appellees (and two other cases).

466

*T. J. Mahoney* and *John A. Hull,* for appellant.

*F. W. Ganoe,* for appellees.

Evans, J.—I.   Three suits by three holders of preferred stock were brought against the same defendants, and were consolidated for trial.   For the purpose of our consideration, we shall treat the three plaintiffs as coplaintiffs in one suit.   The defendants named are the Boone National Bank, Boone National Building Company, and Homer A. Miller.   The Boone National Bank was organized in 1902; the Boone National Building Company in 1907.   The latter company was promoted by the stockholders and officials of the former.   The Boone National Bank went into voluntary liquidation in February, 1925.   Its relation to the Boone National Building Company was a part of its history.   Sometime after the year 1912, the defendant Miller became the holder of a majority of the stock of the Boone National Bank, and so continued down to February, 1924.   The building company was organized upon a capital stock of $90,000, $50,000 thereof being preferred stock, and $40,000 common stock.   All of such stock was fully subscribed and paid.   The bank took and fully paid for all the common stock.   The preferred stock was subscribed and paid for by directors, stockholders, and customers of the same bank.   The plaintiffs Boyd, J. W. Weikel,

and William E. Weikel are holders of preferred stock in the following amounts, respectively,—$1,000, $2,000, and $3,000. The plaintiffs each claim, as against the parent company, a judgment for the amount of their preferred stock, with interest; and this relief was awarded to them by the decree. As against the Boone National Bank, they claim a judgment also, on the ground that the building company was a mere creature of the bank, and that the bank, through its officers, disabled the building company, and rendered it unable to perform its obligation to the preferred stockholders, and that it should be deemed to have elected to take up and to pay for the preferred stock of the building company. As against the defendant Miller, they ask a judgment on the ground that he was the holder of the majority of the stock of the bank, and was, therefore, responsible for all its conduct. They also pray that they be decreed to have a lien upon the assets of the building company which shall be prior and superior to any and all rights or claims of the defendant Miller therein. The foregoing is the substance of their pleading. In argument, it is contended that the bank so conducted the business of the building company that its manipulations operated to the detriment of the preferred stockholders, and inured to the corresponding benefit of the bank. This latter is the major proposition in plaintiffs' case.

Section 2 of the articles of incorporation of the building company was as follows:

"The general nature of the business to be transacted by this corporation shall be the *purchase and sale* of real estate and the improvement and leasing of the same. It shall have power to make contracts, *acquire and transfer real and personal property,* and to make leases of the same, to establish by-laws and make all rules and regulations necessary for the management of its affairs."

Section 3 thereof contained the following:

"The preferred stock shall be a first lien on the assets of the corporation and after ten (10) years from the date of the original issue it may be redeemed at the option of the owner, or it may be called in for cancellation or reissuing."

Section 5 contains the following:

"The affairs of this corporation shall be conducted by a president, vice president, secretary, treasurer, and nine direc-

tors, who shall at all times be under the direction and control of the holders of the common stock.''

Sections 7 and 8 are as follows:

''The highest amount of indebtedness which this corporation shall at any time subject itself shall not exceed two-thirds of its paid-up capital stock, and no indebtedness shall be contracted unless authorized by three fourths (¾) of the preferred stock at some annual meeting or some special meeting called for that purpose.''

''The private property of the members of this corporation shall be exempt from liability for corporate debts.''

It was further provided that the profits of the corporation should first be applied to the payment of dividends upon the preferred stock, not to exceed 6 per cent per annum; and that the preferred stock should mature in 10 years, and should be then payable upon the demand of the stockholder, or be retired at the call of the corporation. The company invested its full capital in one investment. It acquired by purchase a lot in the city of Boone, and erected thereon a six-story building, all at a total cost of $90,000. The first floor of this building was occupied in part by the defendant bank, under a lease from the building company, and in part by another lessee, who conducted a jewelry store therein. The rooms on the other floors were fitted up as offices and club rooms, and lessees therefor were sought. The capacity of the building, however, exceeded the demand. The building proved to be a losing venture from the start. The officers and directors of the defendant bank were elected also as the officers and directors of the building company, the bank itself being the holder of all the common stock. Except for the years 1914, 1915, and 1916, the operation of the building showed a deficit every year. During the three years named, its operation showed a slight profit, not exceeding a total of $800 for the three years. Nevertheless, the building company paid semiannual dividends of 3 per cent to its preferred stockholders for many years. As to these plaintiffs and other preferred stockholders, such payments continued down to January 1, 1924. In the year 1917, the bank acquired $20,000 of this preferred stock. After the acquisition of the same by the bank, no dividends were paid upon that stock at any time thereafter. The bank was, therefore, carrying $40,000 worth of common

stock and $20,000 of preferred stock, without return thereon. For several years, the directors had become desirous of liquidating the building company. In order to do so, a sale of the building would be necessary, and they sought opportunities to that end. In June and July, 1921, they entered into negotiations with one O'Grady, whereby a contract was consummated. Under such contract, they sold the building to O'Grady, and in consideration thereof, received certain second mortgages on real estate, of a face value of $96,000. The mortgages covered 960 acres of land, subject to $80,000 in mortgages, and 160 acres, subject to $26,000 in mortgages,—all these lands being improved farm lands, situated in Palo Alto County. The transfer of the building constitutes the first and basic grievance of the plaintiffs against these defendants. The petition does not charge actual or intentional fraud on the part of the directing body. The argument presented to us is more aggressive in that respect than the pleading. But the ultimate claim is that this transfer of the building violated the rights of the preferred stockholders, and that it reduced the value of their security, and that it operated in the end to the personal advantage of the bank, and to corresponding detriment to these plaintiffs. The evidence fairly shows that the lands thus taken were worth, at a fair valuation, from $80,000 to $87,000 over and above the prior incumbrances thereon. The evidence also shows that such lands are worth now, at a fair valuation, from $53,000 to $59,000 in excess of incumbrance. Appellants concede, as a proposition of law, that, if the directors acted in good faith, and with reasonable care, they are not liable for mere errors of judgment in the business transaction. The trial court found that the directors did act in good faith and with reasonable care at all times, and we think that this finding is clearly supported by the record. But the plaintiffs contend that, under the articles of incorporation, they had a lien upon the building, which was the equivalent of a mortgage thereon, and that their right to such lien was violated by the transfer. They also claim that the transfer of such building was a violation of their right under Section 7, and that such transfer for mortgaged property amounted to the contracting of an indebtedness without the consent of the preferred stockholders, and that this was in violation of

Section 7, above quoted. We have first to inquire, therefore, whether the preferred stockholders had a lien upon the particular pieces of property owned by the corporation, or whether its lien attached to the net assets of the corporation, whatever the form of such assets might be. It will be noted from Section 2, above quoted, that the nature of the business of the corporation was to be the purchase and sale of real estate, etc.; and that it shall have power to make contracts, *acquire and transfer* real and personal property. If the contention of the plaintiffs were sustained, it would be impossible for the corporation to carry out its business as indicated in this section. It is to be noted further that, when this stock was issued, the assets of the corporation consisted wholly in the cash proceeds of the subscriptions to stock. The holder of the stock had no lien upon the building at that time. Whatever lien he acquired thereon resulted from the transmutation of the assets from cash to realty. We think that the lien of the preferred stockholder is a blanket lien upon all the assets, whatever their form, and that it is not a lien upon particular items of property owned by the corporation. To hold otherwise would be to defeat the capacity of the corporation to transact the very business for which it was organized. It could not transfer a piece of real estate without  obtaining a release from every preferred stockholder. Nor was any debt contracted by such transfer, within the meaning of the articles of incorporation. The corporation did not assume the prior mortgages, though it is true that they were a burden upon the title acquired by the corporation. As against this, the contract with O'Grady provided, in effect, that he would protect the second mortgages against foreclosure of the first. At this time, O'Grady was rated by credit agencies as worth $250,000, and the directors had reason to believe that he was responsible, and financially able to carry out his contract.

It is further urged, however, that the disposal of this building amounted to a disposal of all the property of the corporation, and was, therefore, not consistent with its continued ex-  istence; that such an act of dissolution was not valid without the consent of all the stockholders of a solvent corporation. Whatever merit there might be in this proposition, if it were put for-

ward by the common stockholders, it has no application to a preferred stockholder. A preferred stockholder, whose stock has matured, has no legal interest in the continuation of the corporation, provided his right of priority to the assets be protected. It is disclosed by this record that the directors did want to liquidate the corporation, and did want to convert its property into money for that purpose. If done successfully, this would have involved full payment to the preferred stockholders. In their judgment, it was virtually impossible to find a buyer for the building. It was too large for its location, and too large to find a market there. They believed that they could sell the farm lands to better advantage and with less loss than they could sell the building. They had no motive to sacrifice the property, if they could avoid it. The bank had $60,000 of an investment in it. No discrimination was practiced against the preferred stockholders or in favor of anyone. Up to this point, therefore, the plaintiffs have no legal grievance.

II. The later event of which the plaintiffs complain was in February, 1924. This is the event which it is claimed by plaintiffs grew out of the transfer of 1921, and which resulted in great advantage to the bank and in corresponding detriment to these plaintiffs.

It appears from the record that this bank was in distress. It was such distress as might be naturally expected to result from carrying $60,000 for many years in a non-paying invest-ment. Loss faced stockholder and director. Defendant Miller, a nonresident stockholder, and president of a bank in Des Moines, was the majority stockholder. The bank was carrying not only the $60,000 of common and preferred stock, but more than $11,000 of the deficit of the building company. In February, 1924, two contracts were signed by Miller, as one party, and the bank and the other stockholders, as the other party, both contracts being a part of the same transaction. By one contract, Miller took from the bank all of its common and preferred stock, amounting to a face value of $60,000, and the obligations of the building company to the bank for its deficit, amounting to more than $11,000, and paid therefor the sum of $81,000. By the other contract, which does not disclose its actual consideration, the other stockholders of the bank purchased from Miller his

472

entire holding of stock in the bank. This ended Miller's connection with the bank. It also made him the holder of all the common stock and $20,000 of the preferred stock of the building company. The contention for the plaintiffs is that this event was the outcome of the former illegal acts of the directors, and that the bank had profited thereby, in that it had received $40,000 and a premium for common stock that would otherwise have been worthless, and had received $20,000 and a premium for preferred stock of such face value; whereas the plaintiffs are unable to realize upon their stock, except to await the outcome of the liquidation of the building company. This is the discrimination which the plaintiffs claim has been practiced upon them. What difference it could make to the plaintiffs whether the other stock shall be owned by Miller or by the bank, is not explained in the briefs. Needless to say that this transaction between Miller and the bank, and between Miller and the other stockholders of the bank, in no manner concerned the plaintiffs. The fact that the contract whereby the other stockholders purchased Miller's stock was silent as to the amount paid for it, was of no concern to these plaintiffs. The bank was still a going concern, and continued to be such, under the management of other stockholders, for the period of one year thereafter. The stockholders might well have desired that the details of the contract between them and Miller should not receive publicity. If Miller had contributed $81,000 to the bank as his share of the loss sustained in its operation, for the purpose of protecting its depositors and distributing the burden of the loss among the stockholders, surely these plaintiffs could not complain. What basis of complaint, then, could there be to the plaintiffs if Miller saw fit to carry away the stones that had hung on the neck of this bank throughout its career? Miller's legal right to acquire this stock was no less than his legal right to sell his bank stock. The appellants predicate argument upon the assumption that the purchase of this stock from the bank by Miller is evidence that such stock was worth par, plus a premium; whereas the plaintiffs' stock is of doubtful value in their hands; and that the advantage thus held by the bank came about as the result of the transfer of the building to O'Grady, in 1921. The argument is not sound. The plaintiffs have not the slightest legal right or interest involved in the transaction

of February, 1924. We can have no hesitancy in sustaining the finding of the district court to the effect that we find no circumstance in the record which reflects upon the good faith of the directors of the building company in their efforts to handle its affairs.

It appears that Alice Brenton intervened in the case, as a preferred stockholder of 215 shares of stock, which she had acquired since February, 1924, asking that she be protected in the distribution of the assets of the corporation. Plaintiffs contend that she is acting in collusion with Miller, in that the transactions resulting in her purchase of the stock were carried on by her husband, who is a business associate of Miller's, and who purchased the stock at 50 cents on the dollar. The conclusion urged upon us is that the intervener's husband purchased this stock for Miller. If it be so granted, wherein are plaintiffs wronged thereby? It is manifest from the record that the mortgage assets of this corporation have reached the point where they need unified attention and control. O'Grady's responsibility has failed. Other negotiations become necessary. The peril of loss is apparent. While the mortgage assets have value in their real estate security, no present market is available. They are "frozen assets," and may be lost if the thawing be delayed. But the assets of the corporation have been frozen from the beginning. The building itself was a frozen asset, and has continued to be such since its transfer. But no fraud has been practiced upon anyone. All the investors have suffered heavily,—the plaintiffs least of all, because of their receiving dividends actually unearned. One fallacy that has permeated the presentation of plaintiffs' case is their attitude toward the defendant bank, as though it were a human personality, and as such, responsible for the direction of the affairs of the Boone National Building Company. They have assumed to clothe it with powers which it does not possess. It is organized as a bank, under Federal law. The scope of its power and duty is defined by such law. The plaintiffs were charged with knowledge of the limitations upon its powers. The Boone National Bank, as such, had no power to organize the building corporation nor to direct its affairs. The fact that its officers became the officers of the building corporation did not enlarge the powers of the bank itself, nor impose upon it any duty other than that

imposed by the law of its organization. If its officers, including its directors, acted illegally in the management of the building corporation, they are personally responsible for their conduct. The bank is not. If it were, there would be no more reason for charging against the bank the wrongdoings of its directors than there would be for charging the same against the building corporation for the wrongful conduct of its same directors. None of the officials or directors of the bank were made parties defendant, except Miller. Responsibility was charged to him, for the sole reason that he was a majority stockholder. But he was not such when the building association was incorporated or its assets acquired. When he became such, long afterwards, both bank and corporation were already groaning under the incubus of the investment. The sum of the situation, upon this record, is that, in 1907, the stockholders of the bank embarked upon an unfortunate enterprise. One of these plaintiffs, J. W. Weikel, was a stockholder and director in the bank at the time, and served thereafter for several years as director of the building company. There was no bad faith on the part of anyone at any time. The mistake made in originating the enterprise was a great one, but it was an error of judgment only. All the stockholders have suffered, but none have been legally wronged. The decree of the district court puts all preferred stock on a parity, and gives it a first lien upon all the assets of the corporation. This exhausts the power of equity in its favor. The problem of realizing on the assets is a practical one. It could have been done more successfully by amicable conference than by litigation.

The decree of the district court is, accordingly,—*Affirmed.*

STEVENS, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.